| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
|---|---|
| SEAN MONAGHAN,<br>　　　　　　　　　　Plaintiff,<br>– against – | **MEMORANDUM & ORDER** |
| AEROFLOT RUSSIAN AIRLINES,<br>　　　　　　　　　　Defendant. | 16-cv-3528 (ERK) (PK) |

Korman, *J.*:

　　Plaintiff Sean Monaghan brings this action against Defendant Aeroflot Russian Airlines for injuries he sustained to his right thumb aboard a flight between Moscow and New York. Monaghan seeks to hold Aeroflot liable under Article 17 of the Montreal Convention, which imposes strict liability on international air carriers for passenger injuries caused by "accidents." Aeroflot now moves for summary judgment, arguing that there was no "accident" here as defined by Article 17.

## BACKGROUND

　　On November 13, 2015, Sean Monaghan boarded an Aeroflot flight from Moscow to New York. Def.'s & Pl.'s Rule 56.1 Statements (Dkt. Nos. 28-2 & 28-19) ¶ 2. After arriving at his row, he placed his backpack underneath the seat in front of him. Monaghan Dep. (Dkt. No. 28-11) 103:6–9. As he moved the backpack forward, he alleges he sliced his right thumb on something sharp attached to the bottom of the seat. *Id.* at 104:13–18. Monaghan sought the attention of flight attendants, who applied hydrogen peroxide to the wound and covered it with band-aids. *Id.* at 106:6–107:2. Five days after returning to New York, Monaghan went to a doctor, who diagnosed him with a severed tendon that required surgery. *Id.* at 126:11–13, 128:14–129:11. Monaghan then received physical therapy, but he testified that he can no longer

1

use his right thumb as fully as he did before the injury. *Id.* at 157:11–158:4. Monahan is a right-handed, freelance illustrator. *Id.* at 9:24–25, 104:19–21.

The seat that caused Monaghan's injury was Seat 41A. Def.'s & Pl.'s Rule 56.1 Statements ¶ 7. Specifically, according to Aeroflot's expert, this was a Simca 3517-series Aero Seat manufactured by Zodiac Aerospace. Def.'s Expert Report (Dkt. No. 28-7) 5. More than a year after Monaghan's injury, Aeroflot's expert inspected the seat in question. *Id.* at 10. He concluded that the seat's design was approved by U.S. and European aviation authorities, and that its construction was consistent with the manufacturer's specifications. *Id.* at 14. He also found no "extremely sharp metal object affixed to the bottom frame of" the seat, and that the other seats around 41A were identically constructed. *Id.* And based on his review of the aircraft's maintenance records, he saw that the seat had been inspected a number of times, both before and after Monaghan's injury, and that no issues with the seat had been documented. *Id.* at 9–10. Finally, he found no indication of any modification or repairs to the seat since it was manufactured. *Id.* at 14.

Monaghan also had an expert inspect the seat. Looking at the seat around a year and eight months after the incident, his expert noticed that nylon zip ties were used to secure cables underneath the seat. Pl.'s Expert Report (Dkt. No. 28-16) 4. Such ties typically have a hanging end of nylon tape that extends outward as the tie is tightened. This hanging end is generally cut off, but if it is not trimmed flush with the tie's ratchet case, the stub can be quite sharp. In inspecting Seat 41A, Monaghan's expert observed that the free ends of the zip ties were flush with their ratchet cases. *Id.* at 5. But he noted that, in photos Monaghan took of the seat on the day of the injury, the free ends of those ties did not appear to be flush. *Id.* And during his own inspection of the plane, Monaghan's expert found another seat—38A—that had a zip tie with a

2

hanging end. *Id.* Using a device that measures the sharpness of edges—the Sharp Edge Tester Model Set-50—he found that this stub was sharp enough to cut skin. *Id.* By contrast, none of the eight edges he tested under Seat 41A was that sharp. *Id.*

Aeroflot now moves for summary judgment.

## DISCUSSION

I. *The summary judgment standard.*

Summary judgment is required when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), but a "genuine" dispute does exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Frito Lay, Inc. v. LTV Steel Co.*, 10 F.3d 944, 957 (2d Cir. 1993)). A district court's task at summary judgment "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

II. *A trier of fact could find that an "accident" occurred under the Montreal Convention.*

The parties agree that this case is governed by the Montreal Convention, a treaty that "entered into force in the United States on November 4, 2003, updating and replacing the

uniform system of liability for international air carriers previously established by the Warsaw Convention." *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 452 (E.D.N.Y. 2007). The relevant provision is Article 17(1), which provides that:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that *the accident* which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Convention for the Unification of Certain Rules for International Carriage by Air art. 17, May 28, 1999, S. Treaty Doc. No. 106–45, 2242 U.N.T.S. 350 (emphasis added). As Article 17 indicates, a carrier is strictly liable for injuries sustained by a passenger on board an international flight if the injuries result from an "accident." *Lee v. Air Canada*, 228 F. Supp. 3d 302, 306 (S.D.N.Y. 2017). Aeroflot argues that, under the facts here, there was no "accident" and thus it is entitled to summary judgment. This argument fails.

Although the Montreal Convention itself does not define "accident," the Supreme Court defined and explained the term in *Air France v. Saks*, 470 U.S. 392 (1985).[1] In *Saks*, the Court held that an accident is "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405. The Court further explained that "[t]his definition should be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries," and "where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' as here defined caused the passenger's injury." *Id.* But the Court also cautioned that "when the injury

---

[1] *Saks* involved an interpretation of "accident" as it appeared in Article 17 of the Warsaw Convention. But "[b]ecause many of the provisions of the Montreal Convention are taken directly from the Warsaw Convention and the many amendments thereto, the case law regarding a particular provision of the Warsaw treaty applies with equal force regarding its counterpart in the Montreal treaty." *Best v. BWIA W. Indies Airways Ltd.*, 581 F. Supp. 2d 359, 362 n.1 (E.D.N.Y. 2008). Article 17 is one such provision. *See Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp. 3d 436, 441 (E.D.N.Y. 2014).

4

indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* at 406.

The Second Circuit has noted that:

> one of the guiding principles that pervades, and arguably explains, the original Convention, the subsequent modifications, and even the Court's decision in *Saks,* is an apportionment of risk to the party best able to control it, which provides some degree of certainty and predictability to passengers and air carriers, and which encourages them to take steps to minimize that risk to the degree that it is within their control.

*Magan v. Lufthansa German Airlines*, 339 F.3d 158, 162 n.3 (2d Cir. 2003). The Second Circuit advised that "[k]eeping this principle in mind may be helpful when applying the *Saks* definition to a particular fact pattern." *Id.*

With that principle in mind, and cognizant of *Saks*'s directive to "flexibly appl[y]" its definition of an accident, *Saks*, 470 U.S. at 405, a trier of fact could conclude that an accident occurred here under the Montreal Convention. Start with what allegedly happened. At oral argument, Aeroflot conceded that the evidence shows that Monaghan was cut. And Monaghan has furnished evidence that suggests he cut himself on the stub of an inadequately cut zip tie. Although both parties' experts inspected the seat at issue and found no hanging zip-tie ends, Monaghan's expert found, on a seat nearby, an incompletely cut zip tie sharp enough to cut skin. Pl.'s Expert Report 5.

Aeroflot nonetheless protests that "there was nothing unusual or unexpected" here, pointing to its own expert report that the seat conformed to its design specifications, complied with all regulations, and was never modified or flagged as having issues. Def.'s Mem. 9. Similarly, Aeroflot asserts that "it is undisputed that Aeroflot did not have the ability to control or influence the condition of the subject seat that allegedly caused Plaintiff's injury." Def.'s Reply 2. But Aeroflot's assertions ignore the findings of Monaghan's expert, which, as

5

explained, could allow a trier of fact to find that there *was* something unusual or unexpected here—an inadequately trimmed zip tie sufficient to slice human flesh—that Aeroflot very much had the ability to control or influence.

Aeroflot, in its reply brief, claims that Monaghan's expert report contains "logical gaps" and "questionable methods." Def.'s Reply 4. Aeroflot further states, in a footnote, that it is considering challenging the admissibility of Monaghan's expert report and testimony. Aeroflot, however, has not shown how Monaghan's expert report is logically or methodologically flawed, has not moved for exclusion, and has not offered any basis for excluding it.

Nor does it matter that Monaghan alleged in his complaint that he was injured "by an extremely sharp *metal* object affixed to the bottom frame of the seat," not a *nylon* zip tie. Compl. ¶ 12 (emphasis added). It is true that "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985). But in a case involving inconsistencies between facts alleged in a complaint and those advanced in opposition to summary judgment, the Second Circuit has stated that courts should not ignore later, inconsistent evidence "if there is a plausible explanation for [the] discrepancies." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 555 n.2 (2d Cir. 2005)). Here, Monaghan alleged in his complaint that he cut himself on a metal object; he later testified at his deposition that he was cut by "something very hard and very sharp attached to the bottom of the seat," Monaghan Dep. 104:14–16; and he presented expert evidence suggesting he injured himself on a nylon zip tie. There is a "plausible explanation" for these discrepancies. Presumably, like the average traveler, Monaghan was not carefully looking at every small, individual part of the seat under which he placed his bag. It

stands to reason that he did not clearly see which specific part cut him, and, given the prevalence of metal parts underneath an airline seat, he likely assumed he hurt himself on something metal. His failure in his complaint to identify accurately the material of the object that cut him is unsurprising and does not undermine his expert's suggestion—based on inspections conducted *after* Monaghan filed his complaint—that the injury was caused by a nylon zip tie stub.

If Monaghan did cut himself that way—a reasonable conclusion in light of Monaghan's expert evidence—his injury was surely caused by an event "external to the passenger." *Saks*, 470 U.S. at 405. That is, Monaghan injured himself because of the airline's failure to adequately cut the zip tie ends, not because of any condition internal to himself. Indeed, such a finding is favored when, as here, "the airline is in a better position to guard against the incident than the passenger." *Walsh v. Koninklijke Luchtvaart Maatschappij N.V.*, 09-cv-01803, 2011 WL 4344158, at *4 (S.D.N.Y. Sept. 12, 2011). Aeroflot could have simply trimmed the stub to make it flush with the zip tie's ratchet case, thereby removing the sharp edge. Again, as the Second Circuit highlighted, a guiding principle here is to encourage airlines "to take steps to minimize [] risk to the degree that it is within their control." *Magan*, 339 F.3d at 162 n.3. Under these circumstances, and mindful of *Saks*'s instruction to flexibly construe an "accident," a trier of fact could conclude that Monaghan's injuries did not result from his "own internal reaction" but rather were the product of an external, unexpected, and unusual event. *Saks*, 470 U.S. at 406.

Aeroflot's reliance on *Plonka v. U.S. Airways*, 13-cv-7560, 2015 WL 6467917 (E.D. Pa. Oct. 27, 2015), is misplaced. In *Plonka*, the plaintiff struck his leg during takeoff against the hard, plastic in-flight entertainment box bolted beneath the seat in front of him. *Id.* at *1. Observing that the box was part of the aircraft's "approved design and up to eighty-nine other passengers were similarly seated," the court held that it was not unexpected or unusual for

7

plaintiff to be seated in a seat where such a box was located. *Id.* at *2. The court further explained that "courts have held that an airline is not liable for injuries arising from the normal arrangement and operation of aircraft seats." *Id.* Here, by contrast, there is a reasonable possibility that Monaghan's injury did not arise "from the normal arrangement and operation of aircraft seats," but rather from the airline's failure to sufficiently trim a zip tie. Unsurprisingly, Aeroflot has presented no evidence suggesting that leaving such sharp stubs is part of the regular design of the seats. It is one thing to bang your leg against a seat; it is quite another to slash your thumb on one.

III. *Monaghan's motion to strike.*

Finally, Monaghan has moved to strike evidence that Aeroflot included in its reply papers. Specifically, Aeroflot attached an email it received prior to the start of this lawsuit from Monaghan's counsel, in which she stated that Monaghan injured himself on "two round-shaped metal fixtures screwed onto the frame." It is not entirely clear for what purpose Monaghan introduced this email. In its opposition to the motion to strike, Aeroflot stated that "[t]he email accompanied a photograph and serves as an explanatory note of what the photograph depicts as it relates to Mr. Monaghan's claim for personal injury." Def.'s Opp. to Mot. to Strike 1. In its reply brief supporting summary judgment, however, Aeroflot seemingly wanted to use the email to show that Monaghan injured himself on something *metal*, as opposed to a nylon zip tie, as suggested by Monaghan's expert. *See* Def.'s Reply 3 n.1.

In any event, Monaghan argues that the email should be struck because it is inadmissible evidence and because it should have been in Aeroflot's primary motion, not its reply. Ultimately, it is within my discretion to strike portions of reply papers. *Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 513 F. Supp. 2d 18, 19 (S.D.N.Y. 2007); *see also Bayway Ref. Co. v.*

8

*Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000). And I agree with Monaghan. "It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden." *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010). Regardless, even if I did consider the email—assuming that it is even admissible evidence—it would not change my ruling on the summary judgment motion. The email just underscores a factual dispute as to what precisely happened to Monaghan.

The defendant's motion for summary judgment is DENIED.

**SO ORDERED.**

Brooklyn, New York
August 2, 2018

*Edward R. Korman*
Edward R. Korman
United States District Judge